UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER R. ROGERS, SR., | ) | CASE NO. 3:15CV2302 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | GEORGE J. LIMBERT |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | MEMORANDUM OPINION |
| SECURITY ADMINISTRATION, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

Plaintiff Christopher R. Rogers, Sr. ("Plaintiff"), requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  ECF Dkt. #1.  In his brief on the merits, filed on April 19, 2016, Plaintiff claims that the administrative law judge ("ALJ") erred by: (1) violating the treating physician rule; and (2) issuing a decision that was not supported by substantial evidence.  ECF Dkt. #17.  On July 5, 2016, Defendant filed a response brief.  ECF Dkt. #20.  Plaintiff filed a reply brief on July 19, 2016.  ECF Dkt. #21.

For the following reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.

## I.  FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on March 30, 2012 and May 2, 2013, respectively.  Transcript ("Tr.") at 21.[2]  In both applications, Plaintiff alleged disability beginning February 24, 2012.  *Id.*  These claims were denied initially and upon reconsideration.  *Id.*  Plaintiff then requested a hearing before an ALJ, and his hearing was held via video on June 26, 2014.  *Id.*

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]The Transcript for the instant case was filed in the Clerk's Office and is not available through the CM/ECF system.

On September 5, 2014, the ALJ denied Plaintiff's applications for SSI and DIB.  Tr. at 21. The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014.  *Id.* at 23.  Continuing, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 24, 2012, the alleged onset date.  *Id.*  The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease at L5-S1; degenerative joint disease of the thoratic spine; a right knee meniscal tear and partially ruptured Baker's cyst; a panic disorder; and bipolar disorder.  *Id.*  Following an analysis of Plaintiff's severe impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* at 24.  After considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that Plaintiff was limited to: work that could be done in a seated or standing position with a total of sitting, standing, or walking for four of eight hours in a work day; occasionally climbing stairs; no climbing ladders and the like, kneeling, or balancing on one leg at a time; frequent stooping; occasional crouching or crawling; and no exposure to obvious hazards. *Id.* at 27.  Additionally, the ALJ indicated that Plaintiff could: understand, carry out, and remember simple instructions where the pace of productivity was not dictated by an external source over which Plaintiff had no control, such as an assembly line or conveyor belt; make judgments on simple work; respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; and respond appropriately to occasional supervision, but not with the general public at all, and only occasionally with coworkers, but no working in team or tandem with coworkers.  *Id.*

Next, the ALJ determined that Plaintiff had no past relevant work.  Tr. at 33.  The ALJ stated that Plaintiff was a younger individual on the alleged onset date, had at least a high school education and was able to communicate in English, and that the transferability of job skills was not material to the determination of disability because the Medical-Vocational Guidelines supported a finding that Plaintiff was not disabled.  *Id.* at 34.  Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national

-2-

economy that Plaintiff could perform. *Id.* In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 24, 2012, through the date of the decision. *Id.* at 35. Plaintiff filed a request for review of the ALJ's decision with the Appeals Council, which was denied on September 11, 2015. *Id.* at 8. At issue is the decision of the ALJ dated September 5, 2014, which stands as the final decision. *Id.* at 18.

On November 9, 2015, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on April 19, 2016, posing the following questions to the Court for consideration:

1. Whether the [ALJ] erred in her finding concerning [RFC] where she relied on: (1) non-regulatory factors to reject the opinion of long-term treating physician Dr. Reeves; and (2) global assessment of functioning ("GAF") scores to undermine the opinion of treating psychiatrist Gehlot without the support of any other medical opinion.

2. Whether the [ALJ's] finding at step five of the sequential evaluation is supported by substantial evidence where she relied on the wrong numbers to reach her conclusions concerning a significant number of jobs.

ECF Dkt. #17 at 1. On July 5, 2016, Defendant filed a response brief. ECF Dkt. #20. Plaintiff filed a reply brief on July 19, 2016. ECF Dkt. #21.

## II. SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

After finding that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2014 and that he had not engaged in substantial gainful activity since February 24, 2012, the alleged onset date, the ALJ determined that Plaintiff had severe impairments that caused significant limitations in Plaintiff's ability to perform basic work activities. Tr. at 23. Continuing, the ALJ also found that Plaintiff had the following non-severe impairments: hyperlipidemia; a history of opioid dependence; one diagnosis of intermittent explosive disorder; and agoraphobia. *Id.* at 24. The ALJ found that Plaintiff's non-severe impairments were only slight impairments that did not have more than a minimal impact on Plaintiff's ability to perform basic work activities. *Id.* Further, the ALJ stated that Plaintiff's physicians had not opined that these conditions caused any limitations. *Id.* Continuing, the ALJ noted that Plaintiff had the following non-medically determinable impairments: osteoarthritis in his hands; and psoriatic arthritis. Regarding these non-medically determinable impairments, the ALJ stated that nothing in the

-3-

medical record supported a diagnosis of osteoarthritis, and that no tests or laboratory findings supported a diagnosis of psoriatic arthritis. *Id.*

Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. at 24. The ALJ indicated that he considered all listed impairments, with specific mention of Listing 1.02 (major dysfunction of a joint), Listing 1.04 (disorders of the spine), Listing 12.04 (affective disorders), and Listing 12.06 (anxiety related disorders). *Id.* The ALJ stated that Plaintiff failed to meet the requirements of Listing 1.02 because the record did not demonstrate gross anatomical deformity, chronic joint pain, and stiffness with signs of limitation of motion or other abnormal motion of the affected joints. *Id.* Continuing, the ALJ indicated that the record did not show joint narrowing, bone destruction, or ankylosis of the affected joints with involvement of one major peripheral weight-bearing joint resulting in an inability to ambulate effectively. *Id.* The ALJ stated that Listing 1.04 was not met because the record did not demonstrate compromise of a nerve root or the spinal cord with additional findings of: evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, or motor loss accompanied by sensory or reflex loss and positive straight-leg raises; or spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication. *Id.*

Regarding the severity of Plaintiff's mental impairments, the ALJ stated that she considered Listing 12.04 and Listing 12.06, including the paragraph B criteria. Tr. at 25. The ALJ stated that to satisfy the paragraph B criteria, a claimant's mental impairments must result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *Id.* First, the ALJ addressed Plaintiff's activities of daily living. *Id.* The ALJ found that Plaintiff had no limitations regarding his activities of daily living. *Id.* In doing so, the ALJ explained that activities of daily living included activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and

using a post office.  *Id.*  The ALJ then stated that there was no indication that Plaintiff could not use a telephone, telephone directory, or a post office, and that Plaintiff indicated that he has no problems regarding his personal care.  *Id.*  Further, the ALJ indicated that Plaintiff reported that he could dress himself, bathe, care for his hair, shave, feed himself, and use the toilet, and, therefore, the evidence supported a finding that Plaintiff had no limitation in daily activities due to his mental impairments. *Id.*

Next, the ALJ found that Plaintiff had moderate limitations in social functioning.  Tr. at 25. In support of her finding, the ALJ stated that Plaintiff noted that he did not spend time with others, did not go anywhere on a regular basis, did not need to be reminded to go places, and did not need someone to accompany him when he went out.  *Id.*  Additionally, the ALJ stated that Plaintiff also reported that he had problems getting along with friends, family, neighbors, and others because "his anxiety disorder makes him less than friendly sometimes."  *Id.*  Based on these factors, the ALJ determined that Plaintiff had moderate limitations in his social functioning due to his mental impairments.  *Id.*

Continuing, the ALJ found that Plaintiff had moderate limitations in concentration, persistence, or pace.  Tr. at 25.  The ALJ indicated that the bases for this finding was Plaintiff's indication that he could pay attention for five minutes at a time, had problems finishing what he started, could follow written and spoken instructions "okay," and had difficulty handling stress and changes in his routine due to anxiety disorder.  *Id.* at 26.  Next, the ALJ determined that Plaintiff had not had any episodes of decompensation with loss of adaptive functioning requiring increased treatment or placement in a less stressful situation.  *Id.*

The ALJ then indicated that, based on a psychiatric review, the state physician found that Plaintiff had mild restrictions in activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  Tr. at 26.  Continuing, the ALJ stated that upon reconsideration the state physician found insufficient evidence to make a determination.  *Id.*  The ALJ indicated that he gave these opinions little weight as they were inconsistent with the medical record as a whole.  *Id.*  Concluding the discussion on this issue, the ALJ determined that the paragraph B criteria were not satisfied

because Plaintiff's mental impairments did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation, each of expended duration.  *Id.*  The ALJ also indicated that he considered the criteria of paragraph C, and that the criteria were not met because Plaintiff failed to demonstrate the requisite functional limitations and the record did not demonstrate that Plaintiff had a complete inability to function independently outside his home.  *Id.*

After considering the record, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that Plaintiff was limited to: work that could be done in a seated or standing position with a total of sitting, standing, or walking for four of eight hours in a work day; occasionally climbing stairs; no climbing ladders and the like, kneeling, or balancing on one leg at a time; frequent stooping; occasional crouching or crawling; and no exposure to obvious hazards. Tr. at 27.  Additionally, the ALJ indicated that Plaintiff could: understand, carry out, and remember simple instructions where the pace of productivity was not dictated by an external source over which Plaintiff had no control, such as an assembly line or conveyor belt; make judgments on simple work; respond appropriately to usual work situations and changes in a routine work setting that is repetitive from day to day with few and expected changes; and respond appropriately to occasional supervision, but not with the general public at all, and only occasionally with coworkers, but no working in team or tandem with coworkers.  *Id.*

The ALJ indicated that Plaintiff alleged disability in his Adult Disability Report due to osteoarthritis, anxiety, and depression, and reported that these impairments limited his ability to work because he had "difficulty functioning in society," had attempted suicide, and had been incarcerated for assault and battery. Tr. at 28. Continuing, the ALJ stated that Plaintiff testified that he was fifty years old and lived with his spouse, who also had a pending disability claim.  *Id.*  The ALJ indicated that Plaintiff noted that he drove himself to work, had obtained a GED, and had past work experience as a chef.  *Id.*  Next, the ALJ stated that Plaintiff testified that he: had worked as an executive chef at twelve different places, and was usually let go for his aggressive temperament; did not cook at home and usually made "TV dinner[s]"; was unable to work due to mood swings and an aggressive nature; had mood swings and agoraphobia; became stressed out easily and would overreact; was bipolar and had mood swings during which he felt hopeless and cried; needed a knee

-6-

replacement and had "shrinking" discs in his spine; could not cut grass or keep up with housework due to pain; stayed at home and read books due to his agoraphobia; only showered once a week due to his pain; needed his wife to help feed him; could only stand for fifteen minutes, sit for ten minutes, and lift no more than a gallon of milk; and could no longer write or print due to his arthritis. *Id.*

Next, the ALJ discussed the medical evidence. Tr. at 28. The ALJ indicated that x-rays of Plaintiff's right knee taken in January 2010 showed no acute radiographic abnormality, and that x-rays of Plaintiff's spine taken in April 2010 showed evidence of degenerative disc disease at the L5-S1 level, but otherwise the remainder of his lumbar spine was unremarkable. *Id.* Continuing, the ALJ noted in April 2012 that Plaintiff "fell into a ravine [four] or [five] weeks ago and sustained some kind of injury to his right leg." *Id.* The ALJ stated that it was noted in September 2012 that an examination of Plaintiff's knees revealed no gross malalignment, deformity, or effusion on the right side, and a full range of motion, no effusion, and stable stress testing on the left side. *Id.* The ALJ then indicated that records from October 2012 noted that Plaintiff was diagnosed with a panic disorder without agoraphobia, an intermittent explosive disorder, and personality disorder, as well as noting that Plaintiff declined a referral for alcohol and drug counseling "as [Plaintiff] thinks it is not a problem for him," but that Plaintiff agreed to see a therapist. *Id.*

Continuing, the ALJ noted that Plaintiff underwent an evaluation in February 2013, during which he reported that he had severe anger and aggression issues and stated, "I can't work because people say I'm too intimidating and aggressive" and "I need you to either fix me so I can work, or get me on SSI." Tr. at 28. The ALJ also indicated that Plaintiff reported that he was on Percocet and was dependant on his prescription opiates, but wanted to try quitting with Suboxone.[3] *Id.* Additionally, the ALJ stated that in March 2013, Plaintiff noted that Seroquel was helping his mood

---

[3]Percocet is an opioid-based pain medication. Percocet, https://www.drugs.com/percocet.html (last visited October 6, 2016); Suboxone is used to treat opiate addiction - it is not for use as a pain medication. Suboxone, https://www.drugs.com/suboxone.html (last visited October 6, 2016).

and that he was "not getting mad or upset like before."[4]  *Id.*  The ALJ also indicated that Plaintiff

was on a Suboxone program due to his opiate pain medication in April 2013, and that the program

was "working well."  *Id.* at 28-29.  However, as noted by the ALJ, Plaintiff also told another doctor

that he was not on Suboxone for opiate dependency.  *Id.* at 29.

The ALJ next indicated that, in February 2013, x-rays of Plaintiff's spine showed mild

interspace narrowing at L5-S1, minimal marginal hypertrophic spurs involving the superior aspect

of the L5 vertebral body, and minimal hypertrophic spurs involving the L1 vertebral body, but

otherwise Plaintiff's spine was normal in appearance.  Tr. at 29.  Additionally, the ALJ noted that

a physician commented that the Plaintiff had bilateral knee arthritis, although no corresponding x-

rays were taken.  *Id.*

The ALJ next addressed Plaintiff's treatment at the Fisher Titus Medical Center.  Tr. at 29.

First, the ALJ indicated that in June 2013, Plaintiff stated that he was "doing a lot better with his

mood" as it was "more stable" and he felt calm and was not yelling and shouting or getting "pissed

off."  *Id.*  The ALJ stated that Plaintiff noted that he felt good  in July 2013, and Plaintiff reported

that his medications were well balanced and "working beautifully" in September 2013.  *Id.*

 Continuing, the ALJ stated that Plaintiff noted his anxiety was under control in October 2013, and

that Plaintiff indicated that he was feeling "OK" in November 2013.  *Id.*  Also in November 2013,

according to the ALJ, Plaintiff began working as a part-time chef and was able to cope well at his

workplace.  *Id.*  Additionally, the ALJ indicated that Plaintiff denied racing thoughts, panic attacks,

or persistent irritability, and reported that his anxiety was under fair control.  *Id.*

Continuing, the ALJ addressed an October 2012 visit by Plaintiff to Fisher Titus Medical

Center for a refill of his Percocet.  Tr. at 29.  According to the ALJ, during this visit Plaintiff stated

that he was getting his medication from his primary care physician, but was "running short."  *Id.*

The ALJ noted that Plaintiff was sent home with a single Percocet.  *Id.*  Next, the ALJ stated that

Plaintiff was taken to the emergency room at Fisher Titus Medical Center in a confused state in

---

[4]Seroquel is used to treat schizophrenia, bipolar disorder, and major depressive disorder.  Seroquel, https://www.drugs.com/seroquel.html (last visited October 6, 2016).

November 2012, and became alert following a dose of Narcan, "even attempting to tap dance."[5] *Id.* The ALJ indicated that a CT scan of Plaintiff's head was negative and his liver function test was normal, and, therefore, the doctor "suspected prescription drug misuse/overuse." *Id.* According to the ALJ, Plaintiff was again taken to the emergency room at the Fisher Titus Medical Center in a confused state in December 2013. *Id.* The ALJ indicated that Plaintiff's wife brought his medication bottle to the emergency room, and roughly thirty tablets of his benzodiazepines were missing.[6] *Id.* Continuing, the ALJ indicated that Plaintiff's wife said that he used an alternative filling reservoir that accounted for the rest of Plaintiff's medications, however, Plaintiff was again given a dose of Narcan that did "help him wake up." *Id.* The ALJ stated that a CT scan of Plaintiff's head showed no evidence of any acute bleed, no mass, lesion, no structural lesion, and no signs of acute ischemia. *Id.* Further, the ALJ noted that Plaintiff had normal waking and sleeping electroencephalograms. *Id.*

Next, the ALJ indicated that a June 2013 MRI showed a complex tear of the posterior horn and posterior body of the meniscus in Plaintiff's right knee. Tr. at 29. Continuing, the ALJ stated that Plaintiff reported in October 2013 that he was supposed to have surgery on his knee, but the surgery was cancelled due to his failure to follow guidelines requiring that he fast for a specific period before coming to surgery due to the use of anesthesia. *Id.* It was noted by the ALJ that Plaintiff received Medicaid in August 2013, and subsequently went to his family doctor and tried to get back pay for the visits for which he had paid cash. *Id.* at 30. According to the ALJ, Plaintiff was later let go as a patient by his family doctor. *Id.* The ALJ noted that in September 2013, Plaintiff was supposed to make an appointment for pain management at the Fisher Titus Medical Center, but never made an appointment. *Id.* Further, the ALJ indicated that it was also noted that Plaintiff was "already taking narcotics and he did not want to give them up and [did] not want to stop taking them." *Id.* The ALJ then stated that when the Maple City Family Practice contacted

---

[5]Narcan is a nasal spray used for the emergency treatment of known or suspected opioid overdose. Narcan, https://www.drugs.com/pro/narcan.html (last visited October 6, 2016).

[6]Benzodiazepines are used as sedative, hypnotics, anxiolytics, anticonvulsants, and muscle relaxants. Benzodiazepines, https://www.drugs.com/drug-class/benzodiazepines.html (last visited October 6, 2016).

the Fisher Titus Medical Center, it was noted that the former would treat Plaintiff without the use of narcotics, but would allow a "bring down process." *Id.* According to the ALJ, Plaintiff started a new job cooking and washing dishes in November 2013, and Plaintiff reported that the job required lots of stooping and bending. *Id.* Additionally, the ALJ indicated that Plaintiff underwent therapy for his back pain and knee pain in November 2013. *Id.*

Next, the ALJ turned to Maple City Family Practice records from May 2014 noting that Plaintiff was "putting in a water pipe" and complained of "more pain in his lower back," therefore requesting "five to ten Soma[s]."[7] Tr. at 30. The ALJ also noted that Plaintiff reported that his back pain was controlled with the Percocet. *Id.* Further, the ALJ stated that it was noted in June 2014 that Plaintiff continued to smoke two packs of cigarettes per day. *Id.*

The ALJ then discussed October 2012 records from Firelands Counseling noting that Plaintiff was given a GAF score of fifty. Tr. at 30. Continuing, the ALJ explained that GAF scores are ratings of overall psychological, social, and occupational functioning on a hypothetical continuum of mental illness, and are intended to plan treatment, measure impact, and predict outcomes. *Id.* Further, the ALJ stated that GAF scores are considered a snapshot of functioning at the time of the examination, but do not reflect any specific limitations and are not determinative of overall disability. *Id.* The ALJ afforded the GAF score of fifty some weight, and stated that the United States Court of Appeals for the Sixth Circuit has indicated that a GAF score of fifty is consistent with the ability to work. *Id.*

Next, the ALJ addressed Dr. Reeves treatment notes from February 2012, in which Dr. Reeves opined that Plaintiff was disabled from any job which required standing or walking until Plaintiff could get his knee repaired. Tr. at 30. Continuing, the ALJ indicated that in May 2012, Dr. Reeves opined that Plaintiff was markedly limited in his ability to do repetitive foot movements, could only stand for one hour, and could only stand and walk for fifteen minutes without interruption. *Id.* The ALJ stated that in a note on a prescription pad, completed in March 2013, Dr. Reeves opined that Plaintiff was disabled and unfit to work due to osteoarthritis in his knees and

---

[7]Soma is a muscle relaxer that works by blocking pain sensations between the nerves and the brain. Soma, https://www.drugs.com/soma.html (last visited October 6, 2016).

-10-

bipolar disorder, however, in a medical source statement, completed in June 2013, Dr. Reeves opined that Plaintiff could perform sedentary work for eight hours a day for a full work week, would not be absent during a month, and that Plaintiff's pain would not prevent him from being able to perform at least simple tasks. *Id.*

The ALJ afforded Dr. Reeves' February 2012, May 2012, March 2013, and June 2013 opinions partial weight, stating that the opinions contrast sharply with the other evidence of record, and that the fact that Dr. Reeves could go from finding Plaintiff unfit for work to being capable of working full time in a matter of three months without evidentiary support rendered his opinions less persuasive. Tr. at 30. Continuing, the ALJ stated that Dr. Reeves' finding that Plaintiff could perform no standing and no walking made no sense, but that he was nonetheless affording the opinion partial weight because Plaintiff did have some limitations related to his knee. *Id.* The ALJ also discussed the mental functional capacity assessment completed by Dr. Reeves in May 2012 opining that Plaintiff was not significantly limited in any mental category. *Id.* at 31. The ALJ afforded this opinion partial weight as it appeared to rest, at least in part, on an assessment of impairments outside Dr. Reeves' area of expertise, but was nonetheless somewhat consistent with the medical records as a whole. *Id.* Accordingly, the ALJ indicated that she accounted for this opinion in the RFC findings by limiting Plaintiff to simple work with simple instructions and a pace of productivity that was not dictated by an external source over which Plaintiff had no control. *Id.*

Next, the ALJ addressed a medical source statement completed in April 2013 by Upender Gehlot, M.D., opining that Plaintiff had marked limitations in his ability to maintain attention and concentration, perform work activities at a reasonable pace, keep a regular work schedule, interact appropriately with others, and withstand the stresses and pressures of routine unskilled work. Tr. at 31. The ALJ continued, stating that Dr. Gehlot assigned Plaintiff a GAF score of fifty-five in April 2013. *Id.* Additionally, the ALJ indicated that Dr. Geholt assigned the following GAF scores to Plaintiff: fifty in February 2013; fifty-four in March 2013; and fifty-five in April 2013 (for a second time), May 2013, and June 2013. *Id.* Partial weight was afforded to the April 2013 opinion issued by Dr. Gehlot by the ALJ, who indicated that the opinion appeared to contain inconsistencies. *Id.* According to the ALJ, Dr. Gehlot opined that Plaintiff had marked limitations in his ability to

maintain attention and concentration, perform work activities at a reasonable pace, and keep a regular work schedule, however, he assigned Plaintiff multiple GAF scores of fifty-five.  *Id.*  The ALJ then stated that a GAF of fifty-one to sixty corresponds to moderate symptoms or moderate difficulty in social, occupational, or school functioning.  Continuing, the ALJ indicated that Dr. Gehlot's opinion was rendered less persuasive due to inconsistencies and the lack of support in the treatment records.  *Id.*

The ALJ then discussed a medical source statement completed in February 2014 by Dr. Gehlot, opining that Plaintiff would be unable to maintain gainful employment due to the severity of his underlying psychiatric conditions.  Next, the ALJ indicated that statements such as Plaintiff is "disabled," "unable to work," and "cannot perform a past job" are not medical opinions, but, rather, are administrative findings dispositive of a case requiring familiarity with the regulations and legal standards set forth within.  *Id.*  The ALJ then stated that she afforded no weight to Dr. Gehlot's February 2014 opinion as it apparently relied quite heavily on the subjective report and symptoms and limitations provided by Plaintiff, and seemed to uncritically accept as true most, if not all, of what Plaintiff reported, yet, according to the ALJ, there was good reason for questioning the reliability of Plaintiff's subjective complaints.  *Id.* at 31-32.  Additionally, the ALJ indicated that Dr. Gehlot's February 2014 opinion was inconsistent with the assigned GAF scores and that Dr. Gehlot's treatment notes did not support such significant limitations.  *Id.* at 32.

The ALJ then indicated that in June 2013 and September 2013, Dr. Gehlot assigned GAF scores of sixty-five to Plaintiff.  Tr. at 32.  Continuing, the ALJ explained that a GAF score of sixty-one to seventy corresponds to mild symptomatology.  After considering the record as a whole, the ALJ found that a GAF score of sixty-five was consistent with other substantial evidence in the record, and therefore afforded the June 2013 and September 2013 GAF scores great weight.  *Id.*

The ALJ then discussed the physical RFC assessment prepared by the state physician, which opined that Plaintiff could: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently stoop; occasionally crawl crouch, kneel, balance, and climb ramps, stairs, ladders, ropes, or scaffolds; and frequently handle and finger.  *Id.* at 32.  Continuing, the ALJ stated

-12-

that upon reconsideration, the state physician opined that Plaintiff could: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently stoop and balance; occasionally crawl, crouch, kneel, and climb ramps or stairs; and never climb ladders, ropes, or scaffolds. *Id.* The ALJ afforded these opinions great weight, finding that they both were consistent with the medical record as a whole and stating that the opinions provide great insight into the severity of Plaintiff's impairments and how they affect his ability to function. *Id.* Further, the ALJ indicated that he added a limitation in the RFC for a cane despite Plaintiff not having a prescription for one, and, therefore, even if Plaintiff required a cane due to his knee pain, the vocational expert testified that it would not change the jobs that Plaintiff could perform. *Id.*

After consideration of the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Tr. at 32. The ALJ indicated that Plaintiff described activities of daily living that were not limited to the extent one would expect given the complaints of disabling symptoms and limitations. *Id.* Continuing, the ALJ stated that in his Adult Function Report, Plaintiff noted that he had no problems with his personal care or daily activities, however, at other times, Plaintiff's description of the severity of his impairments had been so extreme as to appear implausible. *Id.* As an example, the ALJ indicated that Plaintiff testified that his wife must feed him, yet there was absolutely no medical reason for this in the record. *Id.* Additionally, the ALJ stated that during the alleged period of disability, Plaintiff began working as a part-time chef and noted that he was able to cope well at his workplace. *Id.* at 32-33. The ALJ also pointed to Plaintiff's denial of racing thoughts, panic attacks, or persistent irritability, as well as his indication that his anxiety was under fair control. *Id.* at 33. For these reasons, the ALJ stated that it appeared that Plaintiff had attempted to portray limitations that were not actually present in order to increase the chance of obtaining benefits. *Id.*

The ALJ noted that Plaintiff had been prescribed and had taken appropriate medications for the alleged impairments, which weighed in his favor, but the medical record revealed that the

-13-

medications were relatively effective in controlling Plaintiff's symptoms.  Tr. at 33.  Continuing, the ALJ cited several instances where Plaintiff indicated that his medications were effective in controlling his symptoms.  *Id.*

Additionally, the ALJ indicated that Plaintiff testified that he did not have knee surgery due to costs, insurance, and the travel distance required, however, the record shows that the surgery was cancelled the day it was supposed to take place because Plaintiff did not follow the pre-surgery guidelines.  Tr. at 33.  The ALJ found that while this was only one of many factors considered, this factor, along with the other inconsistencies, colored the overall credibility of Plaintiff's allegations of total disability.  *Id.*  Continuing, the ALJ stated that another factor weighing against the credibility of Plaintiff's allegations is the fact that he continued to smoke cigarettes despite denying treatment, such as the knee surgery, due to alleged financial reasons.  *Id.*  The ALJ noted that Plaintiff was smoking two packs of cigarettes a day while claiming that he did not undergo the recommended surgery due to financial hardship.  *Id.*

The ALJ stated that the fact that Plaintiff went back to work, on a part-time basis and although he was eventually fired, did not diminish the fact that he thought that he was sufficiently capable of greater abilities than those to which he testified.  *Id.*  Lastly, the ALJ indicated that the fact that Plaintiff's impairments did not prevent him from working at that time strongly suggests that these impairments would not prevent Plaintiff from working at the time of the decision.  *Id.*

Following the discussion regarding Plaintiff's RFC, the ALJ determined that Plaintiff was unable to perform any past relevant work.  Tr. at 33.  The ALJ found that Plaintiff was a younger individual on the alleged onset date, had a high school education and could communicate in English, and that the transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled.  *Id.* at 34.  Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  *Id.*  Based on the above, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 24, 2012 through the date of the decision.  *Id.* at 35.

-14-

### III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to

social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward

with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon*

*v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and

makes a determination of disability.  This Court's review of such a determination is limited in scope

by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g).  Therefore, this

Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v.*

*Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings

if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.       LAW AND ANALYSIS

### A.       Treating Physician Rule

Plaintiff first argues that the ALJ failed to give good reasons for the weight given to the opinion of treating physician Dr. Reeves that Plaintiff is limited to fifteen minutes of standing or walking at one time and lifting no more than ten pounds at one time.  ECF Dkt. #17 at 15.  An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  Social Security Rule ("SSR") 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review

-16-

of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Plaintiff asserts that his long-term treating physician, Dr. Reeves, offered several opinions concerning his ability to work. ECF Dkt. #17 at 16. Continuing, Plaintiff indicates that Dr. Reeves' most recent opinion, offered in June 2013, states that Plaintiff could perform sedentary work that did not require him to stand or walk for fifteen minutes at a time and that pain from osteoarthritis would render Plaintiff unable to concentrate to consistently perform detailed or multi-step tasks, but usually would not prevent the performance of "at least simple tasks." *Id.* Plaintiff also highlighted several instances in the record where Dr. Reeves opined that Plaintiff: could not perform any job requiring standing or walking until his knee was repaired; was limited to standing or walking for fifteen minutes at a time, and was unable to lift; and that Plaintiff was unable to work the prior year.

*Id.* at 16-17.  Further, Plaintiff indicates that the ALJ claimed to give the opinions of Dr. Reeves partial weight, but asserts that it is unclear which, if any, of the opinions the ALJ used to form her RFC finding.  *Id.* at 17.  Plaintiff states that the ALJ's reasons for giving the June 2013 opinion of Dr. Reeves partial weight were: (1) it is rendered less persuasive because three months prior, in March 2013, Dr. Reeves had stated that Plaintiff was unfit for work; (2) Dr. Reeves' statement on another occasion indicating that Plaintiff could not meet standing or walking requirements; and (3) Dr. Reeves may have been dishonest in his representation of Plaintiff's limitations based on their relationship of Plaintiff's having been demanding or insistent.  *Id.*

First, Plaintiff asserts that when Dr. Reeves found Plaintiff to be unfit for work in March 2013, the assessment was based on the combination of Plaintiff's osteoarthritis of the bilateral knees and his bipolar disorder.  ECF Dkt. #17 at 17.  Plaintiff contends that Dr. Reeves' June 2013 opinion addressed only the limitations arising from Plaintiff's osteoarthritis, and the fact that he would be more limited by the combination of his impairments is consistent with the Social Security Act.  *Id.* at 17-18.  Second, Plaintiff asserts that Dr. Reeves never stated that Plaintiff could perform "no standing or walking," but instead stated, "I believe [Plaintiff] to be disabled from any job which requires standing or walking."  *Id.* at 18.  Plaintiff avers that this statement was made in the context of an office visit after Plaintiff complained of the difficulty he faced standing on his feet daily for ten hours as an executive chef, and, in this context, Dr. Reeves' statement is not inconsistent with his later, clearer limitation to sedentary work.  *Id.*  Third, Plaintiff asserts that the ALJ drew on speculative reasoning when concluding that Dr. Reeves may have been dishonest in his representation of Plaintiff's limitations based on their relationship and Plaintiff's insistence, and there is no evidence that Dr. Reeves was influenced in this manner.  *Id.* at 18-19.

Continuing, Plaintiff avers that the ALJ's analysis undermines the treating physician rule. ECF Dkt. #17 at 19.  Plaintiff argues that the ALJ's reliance on the opinions of the state agency reviewing physicians for a limited range of light work does not mend the ALJ's analysis.  *Id.*  In support of this argument, Plaintiff asserts that the state agency reviewing physicians reviewed the file in May 2012 and September 2012, before evidence of a MRI of Plaintiff's right knee, taken in June 2013, showed a complex tear of the posterior horn and posterior body of the medial meniscus

-18-

touching the inferior articular surface.  *Id.*  Plaintiff contends that the ALJ gave no indication that he recognized that the non-examining physicians had incomplete records before giving the opinions greater weight.  *Id.* at 20.  Additionally, Plaintiff claims that, at best, he is capable of sedentary exertion, and that a limitation to sedentary exertion is significant in this case because Plaintiff is over age fifty, and thus the sedentary Medical-Vocational Guidelines Grids direct a finding of disabled considering Plaintiff exertional limitations alone.  *Id.*

Plaintiff also asserts that the ALJ's finding concerning Plaintiff's ability to perform the mental demands of work is not supported by substantial evidence.  ECF Dkt. #17 at 21.  Continuing, Plaintiff notes that the ALJ afforded only partial weight to the opinion of his treating psychiatrist, Dr. Gehlot, because the opinion appears to contain inconsistencies.  *Id.* at 21-22.  Plaintiff claims that the only inconsistencies noted by the ALJ involve GAF scores, which do not equate to a claimant's mental RFC.  *Id.* at 22.  Further, Plaintiff avers that the ALJ gave great weight to GAF scores in the sixties that were assigned by Dr. Gehlot when reaching her conclusion concerning Plaintiff's ability to work, and that "there is simply no nexus between the ALJ's [RFC] finding and the GAF scores."  *Id.* at 22-23.  Finally, Plaintiff asserts that the ALJ essentially substituted her own opinion for that of the treating psychiatrist, and that Dr. Gehlot based his opinion on a variety of factors, not simply GAF scoring.  *Id.* at 23.

Defendant contends that the ALJ reasonably weighed the opinion evidence.  ECF Dkt. #20 at 10.  First, Defendant indicates that the ALJ explained that Dr. Reeves' opinions contrast sharply with one another, as well as the other evidence in the record.  *Id.*  As an example, Defendant notes that the ALJ emphasized that just three months after Dr. Reeves opined that Plaintiff was unfit to work, he opined that Plaintiff could perform full-time sedentary work.  *Id.*  Regarding Plaintiff's argument that the opinions were not inconsistent because Dr. Reeves based his March 2013 opinion on his mental and physical limitations, and the June 2013 opinion was only based on his physical limitations,  Defendant avers that the ALJ indicated that Plaintiff's mental limitations were outside Dr. Reeves' area of expertise, and when Dr. Reeves evaluated Plaintiff in May 2012 he concluded that Plaintiff was not significantly limited in any mental category.  *Id.*  Defendant then states that an ALJ may discount a treating physician's opinion where it is unsupported or inconsistent with that

physician's previous examinations. *Id.* (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (additional citations omitted)).

Continuing, Defendant indicates that the ALJ noted that there was no support for Dr. Reeves' conclusion that Plaintiff could perform no standing or walking. ECF Dkt. #20 at 11. Defendant asserts that an ALJ is not bound by conclusory statements from physicians, particularly when those statements are not supported by detailed objective criteria and documentation, and thus it was appropriate for the ALJ to note the lack of support for Dr. Reeves' opinion. *Id.* (citing *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001)). Additionally, regarding Plaintiff's claim that there is no possibility that Dr. Reeves may have issued the opinions out of sympathy or at Plaintiff's insistence, Defendant asserts that the ALJ indicated that it would be difficult to confirm such motives, but based on the substantial departure from the other evidence and their inconsistencies, the ALJ reasonably questioned Dr. Reeves' motives. *Id.* Additionally, Defendant contends that the ALJ provided several other reasons for discounting Dr. Reeves' opinions. *Id.* Continuing, Defendant argues that the fact that the state agency reviewing physicians reviewed the record prior to the June 2013 MRI alone does not detract from the reliability of their opinions. *Id*. Defendant asserts that the ALJ recounted the June MRI evidence and Plaintiff's subsequent scheduled surgery, noting that the surgery was cancelled because Plaintiff failed to follow the instruction to fast. *Id.* at 12. Moreover, according to Defendant, Plaintiff fails to explain how the MRI findings necessitate a more restrictive RFC finding. *Id.*

Next, Defendant addresses Plaintiff's arguments regarding the ALJ's treatment of Dr. Gehlot's opinions. ECF Dkt. #20 at 12. Defendant asserts that the ALJ recounted Dr. Gehlot's opinion that Plaintiff had marked limitations in the ability to maintain attention and concentration for two-hour periods of time, perform work activities at a reasonable pace, keep a regular work schedule, interact appropriately with others, and to withstand the stresses and pressures of routine, unskilled work. *Id.* Continuing, Defendant contends that an ALJ may reject a treating physician's opinion that is inconsistent with that physicians treatment notes, and that the ALJ gave Dr. Gehlot's opinion partial weight because it was inconsistent with the regularly assigned GAF scores of fifty to sixty-five, indicating only moderate to mild limitations. *Id.* Defendant recognizes that GAF

-20-

scores do not equate to a mental RFC, and indicates that the ALJ acknowledged that GAF scores are a snapshot of functioning, do not reflect any specific limitation, and are not determinative of overall disability, and also noted that the Sixth Circuit has indicated that a GAF score of fifty is consistent with the ability to work. *Id.* Finally Defendant asserts that the ALJ reasonably contrasted the extreme limitations in Dr. Gehlot's opinion with the consistently high GAF scores assigned to Plaintiff. *Id.*

Defendant is correct in asserting that the ALJ provided good reasons for the weight afforded to the opinion of Plaintiff's treating physician, Dr. Reeves. The ALJ indicated that she afforded partial weight to Dr. Reeves' February 2012, May 2012, March 2013, and June 2013 opinions.[8] Tr. at 30. Plaintiff focuses on the March 2013 determination and June 2013 opinion when attempting to reconcile Dr. Reeves' treatment and opinion. ECF Dkt. #17 at 17-18. In March 2013, Dr. Reeves wrote on a prescription pad that Plaintiff was disabled from February 2, 2012 to March 5, 2013 due to osteoarthritis in his knees and bipolar disorder.[9] Tr. at 517. The notation on the prescription pad does not elaborate on why Dr. Reeves' indicated that Plaintiff was unable to work for the year prior, or provide any insight as to the circumstances surrounding the issuance of this determination of Plaintiff's ability to work in the form of a single sheet from a prescription pad. *Id.* As for the June 2013 opinion, Dr. Reeves completed a Medical Source Statement indicating that Plaintiff could perform sedentary work for eight hours a day, forty hours per week. Tr. at 515. Further, the June 2013 opinion stated that Plaintiff could: walk fifteen minutes or less at one time; sit for four hours at one time; occasionally lift and carry ten pounds; frequently carry six pounds or less; and constantly finger, handle, and reach. *Id.* Further, the June 2013 opinion indicated that Plaintiff would not be absent from work for a single day per month due to his impairments, and that

---

[8]The four "opinions" cited by the ALJ are not all opinions prepared by Dr. Reeves. *See* Tr. at 238, 257, 515-17. The February 2012 and May 2012 "opinions" cited by the ALJ consist of treatment notes. The March 2013 "opinion" is a determination that Plaintiff was disabled written on a prescription pad. The June 2013 opinion is a medical source statement, and was properly referred to as an opinion.

[9]The prescription pad prepared by Dr. Reeves indicates that Plaintiff was disabled from February 2, 2012 to February 27, 2013, or the date appearing on the prescription pad, which is March 5, 2013. Tr. at 517. Accordingly, the Court will use March 5, 2013 when referring to the end date for which Dr. Reeves determined that Plaintiff was disabled according to the prescription pad.

Plaintiff's pain "prevents ability to concentrate to consistently perform detailed or multi-step tasks but usually would not prevent performance of at least simple tasks." *Id.* at 516.

The two additional pieces of medical documentation prepared by Dr. Reeves that were cited by the ALJ are treatment notes from February 2012 and May 2012. *See* Tr. at 30. The February 2012 treatment notes indicated that Plaintiff complained of right knee pain, and Dr. Reeves stated that he considered Plaintiff to be disabled insofar as he could not perform jobs requiring standing or walking. *Id.* at 257. In May, 2012, Dr. Reeves opined that Plaintiff could stand or walk for one hour in an eight-hour workday, and stand or walk for fifteen minutes without interruption. Dr. Reeves also indicated that Plaintiff's ability to sit was affected, but did not place any limitations on how many hours per workday Plaintiff could sit, or how long he could sit without interruption. *Id.* at 238. Further Dr. Reeves stated that Plaintiff was: not limited in seeing, hearing, or speaking; not significantly limited in bending, reaching, or handling; and markedly limited in repetitive foot movements. *Id.* Dr. Reeves did not indicate whether any limitations applied to Plaintiff's ability to push or pull. *Id.* Plaintiff does not mention either of these treatment notes in his argument that the March 2013 determination and the June 2013 opinion are not consistent, instead only mentioning them in passing when summarizing Dr. Reeves comments on the records concerning disability. *See* ECF Dkt. #17 at 16-17.

The Court finds that the inconsistencies or Dr. Reeves' opinions and the medical evidence were a proper basis upon which the ALJ afforded only partial weight to those opinions. In March 2013, Dr. Reeves wrote:

> Patient was and is disabled from 2-9-12 to 2-27-13 or up until present time of this note [with] further evaluation to continue. Disability due to osteoarthritis bilateral knees & bipolar disorder which he is unfit to work.[10]

Tr. at 517; *see* ECF Dkt. #17 at 17. The above determination was written on a prescription pad and provides no additional reasons or explanation as to why Dr. Reeves believed that Plaintiff was unable to work for the specified dates. Three months later, in June 2013, Dr. Reeves indicated that Plaintiff could work eight hours a day, forty hours a week. Tr. at 515.

---

[10]*See* n. 9, *supra.*

Plaintiff fails to explain why Dr. Reeves suddenly and drastically changed his opinion regarding Plaintiff's abilities.  In an attempt to explain the inconsistencies between Dr. Reeves' March 2013 determination and June 2013 opinion, Plaintiff claims that the ALJ was also considering Plaintiff's physical and mental impairments in the former, and was only considering Plaintiff's physical impairments in the latter.  ECF Dkt. #17 at 17-18.  However, the March 2013 determination provides no explanation as to how Plaintiff's bipolar disorder, in conjunction with osteoarthritis in his knees, rendered him completely unable to work.  Moreover, a Mental Functional Capacity Assessment completed in May 2012, a time at which Plaintiff was unable to work according to Dr. Reeves' March 2013 determination due, in part, to his mental limitations, Dr. Reeves opined that Plaintiff is not significantly limited in any area of mental functioning.  Tr. at 240.  Dr. Reeves' May 2012 Mental Functional Capacity Assessment and his March 2013 determination conflict with one another.  Further, Plaintiff's position that the March 2013 determination that Plaintiff was disabled from February 2, 2012 to March 5, 2013 is consistent with other opinions and medical evidence is belied by the fact that Dr. Reeves completed a detailed mental functional capacity assessment in May 2012 opining that Plaintiff was not significantly limited in any area, as well as the fact that a mere three months after the March 2013 determination, Dr. Reeves issued an opinion indicating that Plaintiff could work.  As such, Dr. Reeves' March 2013 determination is contradicted  by other pieces of medical evidence and opinion evidence.

In addition, as noted by the ALJ, even if Dr. Reeves' March 2013 determination that Plaintiff's mental and physical limitations rendered him unable to work was not contradicted by his other opinions and medical findings, mental health assessments are outside of Dr. Reeves' area of expertise.  *See* Tr. at 31.  Accordingly, Plaintiff has failed to explain why a single determination written in two sentences on a prescription notepad stating that Plaintiff's mental and physical limitations, when taken together, render him disabled should not be viewed as inconsistent with a much more detailed finding three months later indicating that Plaintiff was capable of working eight hours a day, five days a week.  The ALJ provided good reasons to afford Dr. Reeves' opinion less

-23-

than controlling weight as it was inconsistent with the other substantial evidence in the record.[11]  *See Wilson,* 378 F.3d at 544; SSR 96-2p.

Additionally, Plaintiff asserts that the state agency physicians, whose opinions were afforded great weight by the ALJ, reviewed the file before a MRI taken in June 2013 revealed a complex tear of Plaintiff's posterior horn and posterior body of the medial meniscus touching the inferior articular surface.  ECF Dkt. #17 at 19.  However, there will always be a gap between the time the agency experts review the record and issue their opinions and the time the hearing decision is issued. "Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009).  The ALJ was aware of the June 2013 MRI and mentioned it when making her RFC finding.  Tr. at 29.  Moreover, Plaintiff has not made, or attempted to make, a clear showing that the new evidence renders the state agency reviewing physicians' prior opinions untenable.  *See* ECF Dkt. #17 at 20.  Additionally, Plaintiff's assertion that the Medical Vocational Guidelines direct a finding of disabled based on Plaintiff's age and limitation to sedentary work is without merit because the ALJ's RFC did not limit Plaintiff to sedentary work and Plaintiff has failed to show that the Court should disturb the ALJ's RFC finding.[12]  *See id.*

---

[11]Plaintiff also takes issue with the ALJ's statements suggesting that Dr. Reeves may have offered his opinion out of sympathy or at Plaintiff's insistence.  *See* ECF Dkt. #17 at 18-19.  The Court need not address this issue as the ALJ identified good reasons to discount the opinion offered by Dr. Reeves outside of any suggestion or indication that Dr. Reeves opinion was issued out of sympathy or at Plaintiff's insistence.

[12]Plaintiff claims that he is over the age fifty in his brief.  *See* ECF Dkt. #17 at 20.  Plaintiff was born on April 7, 1964, and was forty-seven at the time of his alleged onset date.  Tr. at 34.  Plaintiff's alleged onset date was February 24, 2012, and the date of the ALJ's decision was September 5, 2014.  Tr. at 18. Accordingly, Plaintiff reached age fifty on April 7, 2014 - over two years after the alleged onset date and approximately five months before the ALJ's decision.  Plaintiff's brief does not include this important distinction when attempting to argue that Plaintiff is disabled according to the Medical-Vocational Guidelines based on his age and exertional limitations.  Additionally, Plaintiff does not address the fact that the ALJ only found that he met the insured status requirements of the Social Security Act through March 31, 2014, a date prior to Plaintiff's birthday.  In any event, Plaintiff's argument fails because he was not limited to sedentary work.

-24-

Plaintiff also takes issue with the ALJ's decision insofar as she did not afford controlling weight to the April 2013 opinion of Dr. Gehlot.  ECF Dkt. #17 at 22.  Plaintiff asserts that there is no nexus between the ALJ's RFC finding and the assigned GAF scores.[13]  ECF Dkt. #17 at 22-23. While the Court agrees that GAF scores are not dispositive of disability, Plaintiff is mistaken in claiming that "there is simply no nexus between the ALJ's [RFC] finding and the GAF scores." ECF Dkt. #17 at 23.  Despite Plaintiff's apparent suggestion that the Court disregard GAF scores ranging from fifty to sixty-five that were assigned regularly, there is probative value in the GAF scores assigned by Dr. Gehlot.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). Plaintiff fails to explain why the ALJ erred by taking the GAF scores into consideration when determining the weight to afford Dr. Geholt's opinion, and does not point to any portion of the record that supports the extreme limitations opined by Dr. Geholt.  An ALJ may reject a treating physician's opinion if it is inconsistent with that physician's treatment notes, and, here, the ALJ reasonably afforded Dr. Geholt's opinion only partial weight because it was inconsistent with regularly assigned GAF scores as dictated in Dr. Gehlot's own treatment notes.  *See Bass v. McMahon*, 499 F.3d 506, 511-12 (6th Cir. 2007).  Accordingly, the ALJ did not err when she afforded only partial weight to the opinion of Dr. Geholt.

### B.    Vocational Expert Testimony

Plaintiff also asserts that the [ALJ's] finding concerning a significant number of jobs is not supported by vocational expert ("VE") testimony.  ECF Dkt. #17 at 24.  At the hearing, the ALJ asked the VE how many jobs were available for an individual with Plaintiff's age, education, work experience, and RFC.  Tr. at 620-21.  The VE listed three job titles totaling 560,000 jobs nationally and 14,000 jobs regionally.  *Id.* at 21.  The ALJ then added the additional restrictions of work that could be done in a seated or standing position for a total of sitting, standing, or walking for four hours in an eight-hour workday.  *Id.* at 622.  The VE identified three jobs that Plaintiff could perform with the added limitations, totaling 178,000 jobs nationally and 4,400 jobs regionally.  *Id.* In the decision, the ALJ cited the initial job numbers provided by the VE rather than the reduced

---

[13]Plaintiff raises no arguments regarding the ALJ's treatment of Dr. Gehlot's February 2014 opinion. *See* ECF Dkt. #17.

numbers provided by the VE with the added restrictions, which were ultimately included in the RFC finding.  Tr. at 27.  Plaintiff contends that, based on this error, the ALJ's finding that a significant number of jobs exist in the national economy that Plaintiff could perform is not supported by vocational expert testimony.  ECF Dkt. #17 at 24.

This error on the behalf of the ALJ when finding that a significant number of jobs exist in the national economy that Plaintiff could perform is harmless.  The Sixth Circuit has previously found that 1,350 jobs regionally constituted a significant number of jobs existing in the national economy for the claimant to perform.  *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 2012).  In *Hall*, the Sixth Circuit indicated that 1,350 was not a magic number, and that a determination must be made on a case by case basis, stating "[t]he decision should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation."  *Id.*  In the instant case, the Court finds that 4,400 jobs regionally and 178,000 jobs nationally constitutes the existence of a significant number of jobs that Plaintiff could perform.  The ALJ's RFC finding is not overly restrictive in terms of the type of work that Plaintiff can perform, and the factual circumstances of Plaintiff's situation do not provide reason to believe that 4,400 jobs regionally and 178,000 jobs nationally do not constitute a significant number of jobs.  Accordingly, Plaintiff has failed to demonstrate that the ALJ's error warrants remand of the instant case.

## VI.     CONCLUSION

For the foregoing reasons, the Court AFFIRMS the decision of the ALJ and dismisses the instant case in its entirety with prejudice.


Date: October 7, 2016                              */s/George J. Limbert*
                                                   GEORGE J. LIMBERT
                                                   UNITED STATES MAGISTRATE JUDGE